George S. ROW, III, Appellant,

v.

Holly HOLT, Herbert Houseworth, Town of Osgood, Indiana, William Dramann, Sheriff of Ripley County, Indiana, Ripley County Indiana, Board of Commissioners of Ripley County, Indiana, Appellees.

No. 15A01–0409–CV–405.

Court of Appeals of Indiana.

Sept. 30, 2005.

Rehearing Denied Dec. 13 and Dec. 16, 2005.

George A. Leininger, Gary K. Kemper, Kemper, Collins & Hensley, Madison, IN, for Appellant.

Donald B. Kite, Schultz & Pogue, LLP, Carmel, IN, Attorneys for Herbert S. Houseworth, William H. Dramann, Ripley County, Indiana, and Board of Commissioners of Ripley County

Kirk A. Horn, Mandel, Pollack & Horn, P.C., Indianapolis, Attorney for Holly Holt and the Town of Osgood.

## OPINION

MATHIAS, Judge.

George S. Row, III ("Row") appeals the Dearborn Circuit Court's order granting summary judgment in favor of Officer Holly Holt ("Officer Holt") and the Town of Osgood, Indiana (collectively the "Osgood Defendants"); Deputy Herbert Houseworth ("Deputy Houseworth"), William Dramann, the Sheriff of Ripley County, Ripley County, Indiana, and the Board of Commissioners of Ripley County, Indiana (collectively the "Ripley County Defendants") (all defendants collectively referred to as the "Defendants") on Row's complaint alleging state common law claims for false arrest and false imprisonment.[1] Row raises three issues, two of which are dispositive:

I. Whether there are genuine issues of material fact as to whether probable cause existed for Row's arrest and,

II. Whether the Defendants are entitled to qualified immunity.

Concluding that genuine issues of material fact exist as to "false arrest" and "false imprisonment," and, therefore, the law enforcement officials are not entitled to qualified immunity, we reverse summary judgment and remand for further proceedings consistent with this opinion.

### Facts and Procedural History

Row was involved in an ongoing dispute with Kenneth Bowling ("Kenneth"),[2] Keith Bowling, Vince Simon ("Vince"), and Krystall Bowling Simon ("Krystall") (Vince and Krystall collectively will be referred to as the "Simons") after Row terminated the employment of one of the Bowlings at a farm owned by Row. On September 4, 2001, Row received a protective order in Ripley Superior Court that prohibited the Bowlings, Vince, and Krystall "from abusing or threatening to abuse [him] or a member of his household or contacting him, any member of his household, either directly or indirectly, or damaging his property." Appellant's App. pp. 149, 171, 239–40. At the same time, Krystall was granted a protective order against Row with similar restrictions as those noted above.

On September 17, 2001, Row went to an Osgood, Indiana restaurant for lunch where he encountered Kenneth. Kenneth was disturbed by the protective order and accosted Row by screaming, shoving Row in the shoulder, and using profanity. A restaurant employee asked Kenneth to leave. Row encountered Kenneth again in the parking lot of the restaurant. Row feared for his life and telephoned the Osgood Town Marshal and the Ripley County Sheriff's Department for assistance. Neither law enforcement agency responded directly to Row or made Row aware that an investigation was conducted with regard to his request for assistance.

---

1. Our review of the Appellant's Appendix disclosed the following footnote in Ripley County's brief in support of its motion for summary judgment: "On November 3, 2003, the Court granted the parties' agreed or joint Motion to Dismiss with prejudice the Board of Commissioners of Ripley County, Indiana, from the present case." Appellant's App. p. 23. Also, the Chronological Case Summary ("CCS") entries for November 3, 2003 note that the stipulation and order were "filed." Appellant's App. p. 4. However, the designation for the Ripley County Board of Commissioners remained in the caption after November 3, 2003, and the Board of Commissioners was granted summary judgment in the order directed to the Ripley County defendants.

2. The record discloses that there is a Kenneth Bowling, Sr. and a Kenneth Bowling, Jr. For the most part, the record does not indicate a "Sr." or "Jr." after the name. Inasmuch as the distinction is not relevant to our inquiry on appeal, we make no effort to distinguish between the two.

Later that day, Row went back to the same restaurant for dinner. He consumed two beers with his meal. He then went to the residence of Frank Cox ("Cox") in order to inquire about Cox's availability to perform some work for Row. As Row was leaving Cox's house, the Simons saw Row and began a verbal attack based upon their receipt of the protective orders. They summoned Row to speak to them. Row stopped at his car and retrieved a tape recorder that he placed in his shirt pocket. As the Simons continued their verbal tirade, Cox heard the noise from inside of his house. He went outside and observed as Vince and Krystall were "screaming and shouting" at Row. Appellant's App. p. 236. Cox also observed that

> Vince Simon and Krystall Simon had come from their property into the alley behind affiant's house and, at one time, even came onto affiant's property while they were screaming at [Row].

Appellant's App. p. 237.

Krystall asked Row whether he had a tape recorder. He confirmed that he did. Krystall then grabbed Row's pocket, ripping the pocket in an attempt to remove the tape recorder. In response, Row pushed Krystall's hand away. Appellant's App. p. 231. Cox observed that Row did not strike Krystall or Vince. Vince pushed Row and told him not to touch his wife. Krystall then pushed Row, "causing him to fly backwards." Appellant's App. p. 151. Row returned to his car and drove home.

The Simons telephoned the police. Officer Holly Holt of the Osgood Police Department received the dispatch and went to speak to the Simons at their residence. Also, Ripley County Deputy Sheriff Herbert Houseworth ("Deputy Houseworth") spoke to Officer Holt in an effort to offer assistance. Until he spoke to Officer Holt, Deputy Houseworth understood that there was a report of an intoxicated driver. Officer Holt explained that there was also a battery allegation and that Deputy Houseworth should attempt to locate Row.

In her deposition testimony, Officer Holt admitted some familiarity with the parties' rancorous relationship. Appellant's App. pp. 333–34. Deputy Houseworth testified, "I could have heard just slight information with that. I had never dealt with it personally." Appellant's App. p. 200. Marshal Stepleton, Officer Holt's supervisor, testified that prior to September 17, 2001, Row had made complaints about the Bowlings and the Simons and that "there has just been an ongoing dispute."[3] Appellant's App. p. 196. Also, with regard to information known to local law enforcement agencies, Row testified that:

> I on numerous occasions had called the Ripley County Sheriff's Department about the problems, the Indiana State Police in Versailles about the problems, and the Osgood Town Marshal. So there would have been in my assumption some sort of a physical record of those complaints.

Appellant's App. p. 226.

According to Officer Holt's deposition testimony, when she arrived at the Simons' residence they told her that Row:

> was over at Frank Cox's, Krystall and Vince was over at their trailer. [Row] had came out, they had gotten into an argument or whatever about some papers that were served on Krystall and Vince. At this time they had stated that this went on, you know for a few minutes just arguing back and forth. She had stated that—they had both stated that [Row] was drinking, you could smell the alcohol on him, and told me that there was a conversation about a tape recorder with everything that had hap-

3. Marshal Stepleton was out of town at the time of the incidents on September 17, 2001.

pened on it, and I guess [Row] had shoved Krystall back. Vince then grabbed [Row's] hand and said not to touch his wife, and then it was over with. [Row] said he was calling the cops, Vince and Krystall said they were calling the cops, and then they left. Then [Row left].

Appellant's App. pp. 74–75.

In her deposition, Officer Holt stated that she did not see any marks or any indication of bodily injury to Krystall and that Krystall did not appear to be disheveled. Nonetheless, Officer Holt asked Krystall whether "she wanted to fill out a battery affidavit." Appellant's App. p. 75. Krystall stated that she desired to do so. Officer Holt gave Krystall an affidavit form with blanks. In pertinent part, the affidavit stated:

On or about the 17th day of September, 2001 in [the name of the County is not visible on the affidavit] County, State of Indiana, Sam Row did knowingly touch Krystall R. Simon in [sic] rude, insolent and angry manner, to-wit:

Sam shoved Krystall in the right shoulder with his hand which touching resulting [sic] in bodily injury to shoulder

Appellant's App. p. 69 (underlined portions represent the filled-in blanks on the form).

Officer Holt asked Vince and Krystall to write narrative statements to be placed with the paperwork. Officer Holt "left the statements with them" to complete while she went to Row's house to meet Deputy Houseworth. Appellant's App. p. 76. Officer Holt told Vince and Krystall that she would return for the statements.[4] In her

deposition testimony, Officer Holt also stated that she was not at the Simons' residence "very long. Long enough to hear their side of the story, get the battery affidavit signed and go down the road." Appellant's App. p. 77. Officer Holt did not speak to Cox.

After returning home, and before the law enforcement officer arrived, Row mixed and drank two or three alcoholic beverages. When Deputy Houseworth arrived at Row's residence, he reported that Row was at home, but he waited outside of Row's house until Officer Holt arrived. Row was mixing another drink when he heard the doorbell. In his deposition, Row testified that he

saw two police officers standing there. The officers were Holly Holt ... and ... Deputy Herbert S. Houseworth. [Row] opened the door and invited them into his home. [Officer] Holt informed [Row] that they were there to arrest him for assault on Krystall Bowling Simon. [Row] was stunned and in shock at this revelation. [Row] asked [Officer] Holt what she was talking about and [Officer] Holt informed him that Vince Simon and Krystall Bowling Simon had filed a complaint accusing him of assault. [Row] told [Officer] Holt that he had a tape recording of the entire incident and went to the kitchen to get the recording. [Row] brought the recording to the dining room and offered to play the recording for the officers. [Officer] Holt told [Row] that she did not want to hear the recording and that she was taking the recording for evidence. [Row] asked

---

4. Although Officer Holt testified, at one point in her deposition, that she had the sworn "battery affidavit" with her when she went to Row's residence, she left the supporting "statements" for the Simons' completion while she met Deputy Houseworth. As noted herein, Officer Holt informed Deputy Houseworth that she had the affidavit, but he did not recall seeing the affidavit prior to arresting Row. Moreover, at the time of his arrest, Row was not shown the affidavit or any statements. At the time of his deposition, he had not seen the affidavit; however, he had read the "statements" a few months prior to his deposition.

both officers if they had talked to Frank Cox and they stated no. [Row] was then handcuffed and [Deputy] Houseworth transported him to the Ripley County jail[.]

Appellant's App. pp. 152–53. Officer Holt did not show Row the battery affidavit before arresting him. Later, Deputy Houseworth could not recall whether he saw the affidavit before Row was arrested, but he did remember that Officer Holt told him that she had obtained an affidavit.

At one point, Deputy Houseworth stepped outside to complete a radio check on Row's driver's license. Deputy Houseworth testified in his deposition that when he reentered the house, he discovered Officer Holt handcuffing Row. He testified further that Officer Holt stated that Row had pushed her when she attempted to take the tape recorder from him.

In her deposition testimony, Officer Holt stated that Row pushed her into a door frame when she reached out to take the tape recorder that she believed he was offering to her. Row testified that he did not "recall" touching Officer Holt at all:

> I wasn't even near her. To the best of my recollection I wasn't even near her. I walked out in the kitchen, and I had … the recorder laying on the counter, and picked it up and brought it in and laid it on the dining room table. And Officer Houseworth was standing on one side of the table and Officer Holt was standing … back kind of towards a buffet or a serving area, and I walked -I laid the thing on the table, and then as I best recall she said she was taking it as evidence, and Officer Houseworth was to handcuff me and take me to jail.

Appellant's App. p. 231.

In a narrative statement by Deputy Houseworth approximately six months after the arrest, he noted:

> Due to Rows [sic] aggitation [sic] and the fact that there were Battery Affidavits signed by the complaintants [sic] this officer and Officer Holly Holt decided that Row needed to be put in cuffs, as he was cuffed he tried to spin out of the situation but could not. Row was arrested for Battery which there were battery affidavits signed by the complaintants [sic]. It was also learned from Officer Holly Holt that Row had shoved her at one point in his anger, additional charges were filed for battery on a law enforcement officer or resisting.

Appellant's App. p. 50. Thus, Deputy Houseworth's statement indicated that, prior to any alleged battery of Officer Holt, Row was arrested for allegedly battering Krystall and for being agitated.

Both Officer Holt and Deputy Houseworth believed that Row was intoxicated. Deputy Houseworth did not recall Row using abusive language. He described Row as appearing to believe that "the whole incident was 'frustrating[.]' " Appellant's App. p. 58. He also "remember[ed] some irritation and aggravation in [Row's] voice when …" Row "told some of his side of the incident." Appellant's App. p. 58. Although Officer Holt testified that Row was "screaming and yelling[,]" and cursing, she also testified that "he was on edge, not really irate." Appellant's App. pp. 81, 83. Row denied the use of abusive language during the episode in his home. Both Officer Holt and Deputy Houseworth stated that Row was not cooperative while they attempted to handcuff him and walk him to Deputy Houseworth's car. They stated that Row twisted his hands and planted his feet. Row's version of the incident indicated that he had complied with the requests, but that he had later complained that the handcuffs were too tight.

In her deposition, Officer Holt testified that after Row had been arrested and was being transported to the Ripley County

Jail, she drove back to the Simons' residence to retrieve the statements because they had to be turned in with her "paperwork" for Row's arrest. Appellant's App. p. 86. Officer Holt testified that she did not consider having Row fill out a battery affidavit "because at that time we had Krystall's battery affidavit, and [Row] to me wasn't making a big issue about being battered." Appellant's App. p. 85. Row was held in jail for six and one-half hours, despite efforts to secure his release earlier, because his blood alcohol level was tested at .125. Appellant's App. pp. 94, 48, 223.

Officer Holt turned all of her paperwork over to the county prosecutor. A special prosecutor was appointed and a grand jury was convened. The grand jury returned no indictments against Row for his alleged criminal offenses related to the incidents on September 17, 2001.

In his deposition, the Marshal of the Town of Osgood, Rodney Stepleton, stated that he had received disciplinary complaints against Officer Holt including "drinking with the kids, drag racing[,]" improperly handling evidence, leaving improper comments on an answering machine, and the failure to arrest a man living with her after she discovered the existence of an outstanding warrant for his arrest. Appellant's App. pp. 196–97. Officer Holt was given written warnings, "verbal warnings, [and] suspensions." *Id.* The written disciplinary actions occurred between May 8, 2001, and November 23, 2002. Prior to her resignation from the police force in Osgood in March 2003, Officer Holt was arrested on criminal charges.

On September 13, 2002, Row filed his complaint for false arrest and false imprisonment naming as defendants: Officer Holt, individually and in her capacity as a police officer for Osgood, Indiana; Deputy Houseworth, individually and in his capacity as a deputy sheriff for Ripley County, Indiana; the Town of Osgood, Indiana;

William H. Dramann, the Sheriff of Ripley County, Indiana; Ripley County, Indiana; and the Board of Commissioners of Ripley County, Indiana. By agreement, venue was transferred to the Dearborn County Circuit Court in February 2003. Row alleged that Officer Holt and Deputy Houseworth arrested him without a warrant or probable cause; that he was fingerprinted, photographed, and held for six and one-half hours; that he posted $500 bond; that he "was injured both bodily and mentally and was subject to humiliation, embarrassment, and scorn ... and was obliged to and did expend sums of money for counsel to procure his discharge from arrest, all to his damage." Appellant's App. pp. 173–74.

Row clarified some of his damages in his answers to interrogatories and in his deposition. He stated that the handcuffs were placed on his wrists in a manner that caused his hands and fingers to turn "blue and cold[,]" and that he had repeated nightmares. Appellant's App. p. 184. He alleged that based upon a "sign prepared by the Bowling family" and displayed at a local fair, among other places, he was humiliated. Appellant's App. p. 185. He stated that the sign was displayed in the bed of a truck owned by one of the Bowlings, with the knowledge of local law enforcement officials. Also, he stated: "As a result of my arrest and incarceration, attempts were made to have me removed from various boards, such as Ripley County Planning Commission, Margaret Mary Hospital Board of Trustees [and that his] wife was telephonically harassed[ ]." Appellant's App. p. 185.

The Ripley County Defendants moved for summary judgment in November 2003. In the memorandum in support of the Ripley County Defendants' motion, they asserted that they were entitled to summary judgment "for the reasons that (1) plaintiff George S. Row, III's ... arrest

was supported by the existence of probable cause; (2) the Ripley County Defendants are entitled to qualified immunity; and (3) in the absence of a viable claim against Ripley County Deputy Sheriff Houseworth, Row is unable to establish the liability of the Ripley County Sheriff or the County itself." Appellant's App. p. 23.

The Osgood Defendants moved for summary judgment in January 2004. They urged that "there is no genuine issue of material fact and that there was probable cause for Plaintiff's arrest and all remaining claims are barred under the immunity provisions of the Indiana Tort Claims Act." Appellant's App. p. 251.

On January 16, 2004, Row filed his response to the Ripley County Defendants' motion for summary judgment. Row filed his response and designated evidence to the Osgood Defendants' motion on February 19, 2004. Row's responses and designated evidence included an affidavit by Robert J. Snyder ("Officer Snyder"), a patrolman with the St. Matthews, Kentucky Police Department. Officer Snyder's experience included public safety at the University of Louisville, internal affairs with the Louisville Police Department, and police duties with the United Nations International Police Task Force in Bosnia–Herzegovina, Gradiska Bosnia. Officer Snyder based his affidavit upon his experience, his review of the depositions by Row, Officer Holt, Deputy Houseworth, and Marshal Rodney Stepleton, the exhibits including witness statements, and the battery affidavit. In relevant part, he averred:

6. From his review of the material, affiant has formed the opinion that Holly Holt and Herbert Houseworth apparently knew or should have known that George S. Row, III and Vince Simon and Krystall Simon were involved in an ongoing feud.

7. From his review of the materials, it is apparent that Holly Holt and Herbert Houseworth failed to interview an independent eyewitness (Frank Cox) when that eyewitness was readily available. It is affiant's opinion that any prudent law enforcement officer would have interviewed an available eyewitness before making an arrest in this situation.

8. It is affiant's opinion that Holly Holt and Herbert Houseworth, in their actions involving Sam Row on September 17, 2001 took sides which is a violation of proper law enforcement procedure. There were no signs of injury to either Vince Simon or Krystall Simon, and these officers should have advised the Simons to take out a warrant before any arrest of Mr. Row was made.

9. In over thirty years of experience in law enforcement by this affiant, it is affiant's opinion that arresting a citizen who has no arrest record; handcuffing that citizen; and transporting that citizen to jail is a traumatic experience and should be done by a law enforcement officer only as a last resort. The mission of a law enforcement officer is to protect life and property, and a physical arrest of a citizen should be made only as a last resort in order to protect either the citizen or the public.

10. It is the opinion of this affiant that it was inappropriate under the circumstances, to base the arrest of George S. Row, III on the uncorroborated statements of Vince Simon and Krystall Simon.

11. It is this affiant's opinion that a reasonably prudent law enforcement officer, acting on the totality of the facts and under the circum-

stances of this case occurring on September 17, 2001, either within the personal knowledge of the arresting officers or readily available to them, would not have arrested George S. Row, III on September 17, 2001.

12. At the time of the arrest of George S. Row, III, Officers Holt and Houseworth did not have sufficient facts and reasonably reliable information and failed to conduct a sufficient investigation that would lead a law enforcement officer of reasonable prudence and caution to believe that George S. Row, III had committed the crime for which he was arrest[ed] and in so failing, Officers Holt and Houseworth were remiss in their duties.

13. It is the opinion of this affiant that, at the time of the arrest of George S. Row, III, Officers Holt and Houseworth lacked probable cause to arrest George S. Row, III.

Appellant's App. pp. 247–49.

A hearing on summary judgment was held on June 3, 2004. The parties thereafter filed other submissions in support of and opposing summary judgment. On August 23, 2004, the trial court entered separate orders granting summary judgment to the Osgood Defendants and the Ripley County Defendants. The Chronological Case Summary ("CCS") reveals that also on August 23, 2004, the Defendants' request to strike Officer Snyder's affidavit was denied. On September 3, 2004, the trial court entered an amended order granting summary judgment to the Ripley County Defendants.

This appeal ensued. Additional facts necessary to our analysis are provided below.

## Standard of Review

Our standard for reviewing a summary judgment motion is the same standard used in the trial court:

Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

*Tom–Wat, Inc. v. Fink,* 741 N.E.2d 343, 346 (Ind.2001) (citations omitted). "A party seeking summary judgment bears the burden of showing the absence of a factual issue and his entitlement to judgment as a matter of law." *Harco, Inc. of Indianapolis v. Plainfield Family Dining Assoc.,* 758 N.E.2d 931, 937 (Ind.Ct.App.2001) (citation omitted). All pleadings, affidavits, and testimony are to be construed liberally and in the light most favorable to the nonmoving party. *May v. Frauhiger,* 716 N.E.2d 591, 594 (Ind.Ct.App.1999).

For summary judgment purposes, a fact is "material" if it bears upon the ultimate resolution of relevant issues. *Orban v. Krull,* 805 N.E.2d 450, 453 (Ind.Ct.App.2004). "[A]ny doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party." *Am. Mgmt., Inc. v. MIF Realty, L.P.,* 666 N.E.2d 424, 428 (Ind.Ct.App.1996). "Even if it appears that the nonmoving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences." *Thayer v.*

*OrRico,* 792 N.E.2d 919, 923 (Ind.Ct.App. 2003) (quoting *Link v. Breen,* 649 N.E.2d 126, 128 (Ind.Ct.App.1995), *trans. denied* ). Finally, "[o]ur analysis proceeds from the premise that summary judgment is a lethal weapon and that courts must be ever mindful of its aims and targets and beware of overkill in its use." *Bunch v. Tiwari,* 711 N.E.2d 844, 847 (Ind.Ct.App.1999).

## I. False Arrest

Row's complaint can fairly be read to allege state common law causes of action for false arrest and false imprisonment. Row's complaint does not specifically allege any federal claims.

■ "A defendant may be liable for false arrest when he or she arrests a plaintiff in the absence of probable cause to do so." *Earles v. Perkins,* 788 N.E.2d 1260, 1265 (Ind.Ct.App.2003). The existence or absence of probable cause is key to our inquiry. Probable cause for an arrest can be shown by facts and circumstances known to the arresting officer that would warrant a person of reasonable caution and prudence to believe that the accused had committed or was committing a criminal offense. *Id.* Thus, the existence of probable cause for the arrest forecloses a plaintiff's action for false arrest, and the inquiry comes to a halt. *See Conwell v. Beatty,* 667 N.E.2d 768, 775 (Ind.Ct.App. 1996); *Garrett v. City of Bloomington,* 478 N.E.2d 89, 93 (Ind.Ct.App.1985), *trans. denied.*

At the time of Row's arrest, the applicable statute with regard to law enforcement officers affecting arrests, Indiana Code section 35–33–1–1, provided:

(a) A law enforcement officer may arrest a person when the officer has:

(1) a warrant commanding that the person be arrested;

\* \* \* \* \* \*

(4) probable cause to believe the person is committing or attempting to commit a misdemeanor in the officer's presence;

(5) probable cause to believe the person has committed a:

(A) battery resulting in death under IC 35–42–2–1(a)(5);

(B) battery resulting in bodily injury under IC 35–42–2–1; or

(C) domestic battery under IC 35–42–2–1.3.

The officer may use an affidavit executed by an individual alleged to have direct knowledge of the incident alleging the elements of the offense of battery to establish probable cause . . . .

Ind.Code § 35–33–1–1 (Supp.2001).

The Defendants contend that the existence of the battery affidavit executed by Krystall, an admission by Row that he touched Krystall when she attempted to remove the tape recorder from his pocket, and Row's commission of other offenses when Officer Holt and Deputy Houseworth were at his house, demonstrate that the officers had probable cause to arrest Row, thereby foreclosing his civil action for false arrest and false imprisonment. In making their arguments, the Defendants rely only upon the evidence consistent with summary judgment. Importantly, while our standard of review on summary judgment allows us to review only the designated evidence, we review that evidence in the light most favorable to the nonmovant.

### A. Battery Affidavit

■ We analyze first the question of whether the existence of the battery affidavit executed by Krystall presented unrefutable evidence that probable cause existed for Row's arrest. We conclude that it did not.

The Ripley County Defendants contend that once Krystall signed the battery affi-

davit, Officer Holt and Deputy Houseworth were not obligated to pursue any further investigation because they, *ipso facto,* had probable cause. Citing *Forman v. Richmond Police Dept.,* 104 F.3d 950, 962 (7th Cir.1997), and quoting *Eversole v. Steele,* 59 F.3d 710, 718 (7th Cir.1995), the Ripley County Defendants urge that once the police have "sufficient" probable cause, there is no constitutional obligation to conduct further investigation "in the hopes of uncovering potentially exculpatory evidence." Br. of Appellees, Ripley County Defendants at 18.

Significantly, both Officer Holt and Deputy Houseworth testified in their depositions that typically they conduct an investigation before arresting someone accused of battery, even with the existence of a battery affidavit. Appellant's App. pp. 204, 325. Further, Marshal Stepleton's testimony confirmed that procedure. Appellant's App. p. 199.

The following colloquy occurred during Officer Holt's deposition:

Q. Based on your training and your experience as an officer for the Town of Osgood, was it your belief on September 17th, 2001 that all you needed to arrest Sam was the battery affidavit there as Exhibit C?

A. What do you mean? If we have the battery affidavit can we arrest them?

Q. Yes.

A. Well, yes, you can arrest them, but you usually try to investigate what is going on and at least talk to the person.

Appellant's App. p. 325.

During Deputy Houseworth's deposition testimony, the following colloquy occurred:

Q. In standard operating procedure for you after you have taken the battery affidavit and interviewed the victim, what do you ordinarily do next? I mean, let me ask you, would you normally go try to talk to the person who allegedly battered the victim?

A. I normally try to find out as much as I can about the situation and base my decisions on that.

Q. In your experience when investigating batteries that have not as you stated left a mark, would it be usual for you to arrest the alleged batterer of the victim without a warrant?

A. It all depends on the situation. If the officer—if I'm comfortable with leaving both parties until a warrant can be obtained, or if the prosecutor can make a decision on whether or not a warrant is issued, if I feel comfortable leaving that time frame with both parties that nothing else is going to occur, I've done that before.

\* \* \* \* \* \*

Q. In what information you did have you were not aware of any particular threat to the Simons by Mr. Row, just from your own information, information you had at that point in time?

A. Correct.

Appellant's App. p. 204.

In his deposition, Marshal Stepleton stated that he interviewed Frank Cox because Officer Holt failed to do so. Moreover, he confirmed that when conducting an investigation of an alleged battery he would attempt to "interview everybody that I can if I know who is involved." Appellant's App. p. 199.

Officer Holt's testimony revealed that she did not follow her usual practice to conduct a minimal investigation of the battery allegation, and she acknowledged that she had been given information regarding the surrounding circumstances when she

interviewed the Simons. Deputy Houseworth's testimony also revealed that he did not follow his normal practice of obtaining a warrant when he is comfortable that the parties are safely separated. He admitted that was the case here. The combined testimony of Officer Holt, Deputy Houseworth, and Marshal Stepleton does not support the Defendants' contention that the inquiry as to probable cause is foreclosed because Officer Holt acted upon the battery affidavit signed by Krystall.

Moreover, viewing the undisputed evidence that was known to Officer Holt at the time of Row's arrest, no further investigation had to be conducted "in the hopes of uncovering potentially exculpatory evidence" because the cursory investigation had already revealed the existence of important and potentially exculpatory evidence, including: 1) the Simons were arguing with Row about "papers that were served on Krystall and Vince"; 2) Row was confronted by the Simons while he was at Cox's residence; thus, Cox was a potential eyewitness; 3) the Simons were disturbed because Row had a tape recorder; 3) there was a likelihood that Krystall was the aggressor in a shoving match because Row "had shoved Krystall back"; 4) Krystall displayed no signs of bodily injury or that a battery had occurred; and 5) Row had felt wronged because the Simons told Officer Holt that Row threatened to call the police. Appellant's App. pp. 47–48; 74–78. Thus, even viewing only the information from the Simons, numerous indications existed that the Simons could have ulterior motives in making the battery affidavit or were attempting to inoculate their own possibly criminal conduct by registering their complaints first to the police. We cannot conclude that as a matter of law, a person exercising reasonable prudence and caution would not have questioned the Simons' credibility as to the alleged battery.

In addition, Row designated the affidavit of a law enforcement officer, Officer Snyder, which stated that from the evidence that was known, or reasonably should have been known, to Officer Holt and Deputy Houseworth, "any prudent law enforcement officer would have" conducted additional investigation prior to arresting Row on the allegations by the Simons. Appellant's App. pp. 247–49. Upon such testimony, it would be within the province of a trier of fact, rather than a judge on summary judgment, to determine whether Officer Holt had been presented with information that a reasonable person would question when determining whether probable cause existed to arrest Row without a warrant. That is especially so here, inasmuch as Officer Holt and Deputy Houseworth indicated that under similar circumstances their practice is to conduct further investigation and/or to obtain a warrant.

The Osgood Defendants urge that the "fact-sensitive on-the-spot determination of probable cause by the officer often involves an exercise of judgment, which turns on the assessment of probabilities and particular factual context—not readily, or even usefully, reduced to a neat set of legal rules." Br. of Appellees at 2 (citing *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir.1993)). The Osgood Defendants urge that police officers in general, and Officer Holt specifically, should not be subjected to a standard that includes the knowledge of hindsight. Read in context, however, the *Maxwell* court's warning was directed to the likelihood that probable cause determinations should be made by triers of fact, unless the underlying facts are undisputed. *See Maxwell*, 998 F.2d at 434. We agree that the on-the-spot determinations that must be made by officers cannot include prescience, hindsight, or knowledge of unobservable matters. Yet, as outlined above, even Officer Holt acknowledged that the Simons had

given her information that would cause a person of reasonable prudence to investigate the incident prior to either offering to allow Krystall to execute a battery affidavit or pursuing an arrest of Row without a warrant.

■ We also make our analysis based upon the objective good faith of the officers. A police officer cannot be held liable for false arrest if "the officer believed in good faith that the arrest was made with probable cause and that such belief was reasonable."[5] *Garrett*, 478 N.E.2d at 94 (citing *Brubaker v. King*, 505 F.2d 534, 536–37 (7th Cir.1974), *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 456 F.2d 1339, 1348–49 (2nd Cir.1972), *Gomez v. Adams*, 462 N.E.2d 212, 222 (Ind.Ct.App.1984); and *Mitchell v. Drake*, 172 Ind.App. 376, 360 N.E.2d 195, 198 (1977)).

The Defendants urge that the *Garrett* court employed "a less stringent standard of conduct" on the police officers in the context of a false arrest claim. *See Garrett*, 478 N.E.2d at 95. Whether viewed as a less stringent standard or as the fact that a "good faith" belief does not hinge upon the ultimate accuracy of that belief, the *Garrett* court properly recited the standard set out above, and noted: "the arrest is not actionable unless made in bad faith or with an unreasonable belief in the constitutionality of one's actions." *Id.*

Row designated substantial evidence of surrounding facts that indicated that law enforcement officials, specifically Officer Holt, Deputy Houseworth, and Marshal Stepleton, knew of the parties' enmity prior to Krystall's allegation of battery against Row on September 17, 2001. Row also designated evidence that the Town of

Osgood and Officer Holt's supervisor had reprimanded Officer Holt for, at a minimum, conduct unreasonable for a law enforcement officer. With regard to the inquiry as to good faith and reasonableness, Row designated substantial evidence from which a trier of fact could determine that the law enforcement officers here arrested him in bad faith or with an unreasonable belief in the constitutionality of their actions.

In summary, despite crucial pieces of information directly related to probable cause, Officer Holt did not attempt to speak to Cox, and she offered to allow the Simons to fill out statements and complete a "battery affidavit." Appellant's App. p. 75. Then, without showing Row the battery affidavit, and without waiting for the written statements[6] by the Simons that she believed were necessary for the completion of the paperwork on Row's arrest, Officer Holt met Deputy Houseworth at Row's residence to arrest Row.

The designated evidence here is not undisputed; nor does it lead to only one conclusion. There remain genuine issues of material fact as to whether Officer Holt and Deputy Houseworth had probable cause to arrest Row relying solely on the "fill-in-the-blanks" affidavit executed by Krystall in light of the acknowledgements made by the Simons during their recitation of the events to Officer Holt and in light of the surrounding circumstances.

### B. *Row's "Admission"*

■ Next, the Defendants contend that Row "admitted" to battering Krystall: "Most important, Row admitted in his deposition that he did shove Krystall Simon's

---

**5.** This court in *Garrett* acknowledged that the "good faith" standard is equally applicable to state common-law claims for false arrest, false imprisonment, and malicious prosecution and to federal claims made under 42

United States Code section 1983. *Garrett*, 478 N.E.2d at 93.

**6.** Vince's statement contains a notation that it was written by Krystall.

hand away in a rude, insolent manner while at her residence and that this act could be considered the crime of battery." Br. of Appellees, Ripley County Defendants at 11; *see also* Br. of Appellees, Osgood Defendants at 3–4. We disagree with that expansive interpretation of the deposition testimony.

At his deposition, Row was asked to respond to several legal concepts, including his understanding of the definition of battery. He prefaced his answers with disclaimers, noting that he was responding as a layman without legal training. He acknowledged that seemingly just touching someone, especially a police officer, could lead to a charge of battery. However, his acknowledgement that he pushed Krystall's hand away from him in "self-defense," as she grabbed his pocket and ripped his shirt in an attempt to take his tape recorder (an attempted theft by Krystall if true), is certainly not an admission that probable cause existed to arrest him for battery.

### C. *Commission of Other Offenses*

■ Next, we turn to the Defendants' contention that even if Row's arrest for allegedly battering Krystall was not supported by probable cause, Row's alleged battery of Officer Holt and other possible offenses committed during his arrest provided sufficient probable cause to support Row's arrest.[7] Upon appellate review un-

der summary judgment review standards, the Defendants' assertions must fail.

For summary judgment purposes, Officer Holt's allegation that Row committed a battery by pushing her when she reached for the tape recorder could not supply the necessary probable cause to arrest Row because that allegation is disputed. *See Earles*, 788 N.E.2d at 1264 (all facts and reasonable inferences are construed in favor of the nonmoving party on review of summary judgment); *cf. Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir.1993) (probable cause assessment typically within province of the jury, unless underlying facts supporting the probable cause determination are not in dispute). Deputy Houseworth stated that he did not observe the battery on Officer Holt. Row contends that it did not happen. Here, the facts supporting the battery on Officer Holt are highly disputed; thus, on summary judgment, probable cause could not be established upon the alleged second battery.

Further, the Defendants contend that Row could have been charged with disorderly conduct and resisting law enforcement for his "argumentative, intoxicated and tumultuous demeanor" because he "smelled of alcohol, was screaming and yelling and generally obnoxious." Br. of Appellee, Osgood Defendants at 9. Relying

---

7. The Defendants rely on a federal concept, "closely related" offenses, which provided that in section 1983 false arrest actions, probable cause need not have existed for the charge on which the plaintiff was arrested so long as probable caused existed for plaintiff's arrest on a "closely related" charge. *See Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993). However, the "closely related" offense doctrine subscribed to by several federal circuits, and some variations thereon, was rejected by the Supreme Court in *Devenpeck v. Alford*, 543 U.S. 146, 125 S.Ct. 588, 594–95, 160 L.Ed.2d 537 (2004). The Court deter-

mined that the attempt to confine the inquiry whether probable cause existed for an arrest "to offenses closely related to (and supported by the same facts as) those identified by the arresting officer" would not obtain the desired result that officers would cease making sham arrests "but rather that officers would cease providing reasons for arrest." *Id.* at 595. The concept, before its demise, was inapposite here because the officers were not choosing among several possible charges on the same set of facts. Rather, the officers alleged additional circumstances to warrant the existence of probable cause.

upon yet another concept, "collective knowledge," they argue:

> In fact, of course, the designated evidence shows that Row also battered Officer Holt. Thus, based upon the collective knowledge doctrine, Deputy Houseworth was also entitled to arrest Row for battering Officer Holt as the battery was committed in Officer Holt's presence.

*Id.* at 17 (citations omitted).

 The determination whether an officer had probable cause to arrest may be based upon the "collective knowledge" of the law enforcement agency. *Duncanson v. State*, 509 N.E.2d 182, 185 (Ind.1987); *see also Garrett*, 478 N.E.2d at 94. Here, however, the Defendants cannot rely upon other possible offenses allegedly committed by Row, *especially when he was being arrested in his home*, because the facts surrounding Row's conduct during the arrest are in dispute. *See Earles*, 788 N.E.2d at 1264.[8] In this regard, it is important, although not dispositive, to note that the grand jury did not indict Row for the battery of Krystall, the battery of Officer Holt, any matter relating to his conduct at the time of arrest, or any matter relating to his consumption of alcohol.

Under all of these facts and circumstances, the Defendants were not entitled to summary judgment on Row's false arrest claim. Far too many genuine issues of material fact remain and preclude summary judgment.

## II. False Imprisonment

 Next, we examine Row's claim of false imprisonment. "Under Indiana law, false imprisonment is defined as the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Earles*, 788 N.E.2d at 1265 (citing *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind.Ct.App.2002)). "False imprisonment may be committed by words alone, or by acts alone, or by both and by merely operating on the will of the individual, or by personal violence, or both." *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind.Ct.App. 2001) (quoting 35 C.J.S. False Imprisonment § 14, at 444 (1999)). Although false arrest and false imprisonment are often

---

8. Also, we observe that the Defendants complain of Row's conduct inside his home after he protested his arrest. Although the common law rule that allowed individuals to resist with reasonable force an unlawful arrest was long ago abrogated in favor of a legal remedy through civil actions, "[w]e have not ... interpreted this rule as a blanket prohibition that criminalizes any conduct evincing resistance where the means used to affect an arrest are unlawful." *Alspach v. State*, 755 N.E.2d 209, 211 (Ind.Ct.App.2001), *trans. denied; see also Adkisson v. State*, 728 N.E.2d 175, 178 (Ind.Ct.App.2000) (recognizing abrogation of rule and reversing conviction for resisting law enforcement where officer announced to defendant that she was under arrest for battery on a neighbor after officer entered house).

We are cognizant also of decisions that have allowed persons to exercise their freedom of speech to verbally protest actions by law enforcement officers. *See Norwell v. City of Cincinnati*, 414 U.S. 14, 15–16, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973) (disorderly conduct conviction overturned when person questioned on street continued to walk and stated that he was not required to answer police officer's questions); *Price v. State*, 622 N.E.2d 954, 964 (Ind.1993) (overturning disorderly conduct conviction based upon defendant's yelling obscenities at officers arresting a third party); *In the Matter of U.M*, 827 N.E.2d 1190, 1192–93 (Ind.Ct.App.2005) (overturning disorderly conduct conviction after juvenile cursed and protested treatment of third party by police officer). Here, there is a genuine issue of material fact as to whether Row used any abusive language while protesting his arrest. Indeed, it is not at all clear that his use of abusive language directed to officers who were arresting him in his house, in the absence of a warrant and without showing him an affidavit allegedly supporting probable cause, would have constituted a crime in any event.

referred to in case law as though they represent one cause of action, they can be distinct. A false imprisonment claim can be made absent an arrest. *See e.g., Dietz,* 754 N.E.2d at 967–68. We find the following general explanation instructive:

The terms "false arrest" and "false imprisonment" are virtually synonymous, and are sometimes considered to be the same tort. A false arrest is one means of committing a false imprisonment, and every false arrest has, at its core, a false imprisonment.... [A] distinction has been drawn between false arrest and false imprisonment in that a false arrest must be committed under assumption of legal authority whereas a false imprisonment may be committed without any pretense of legal authority.

35 C.J.S. False Imprisonment § 3 at 435–36 (1999) (footnotes and citations omitted).

■ Inasmuch as Row's claim for false imprisonment stems from his alleged false arrest, we need not make a separate analysis for the former. Our decision that genuine issues of material fact preclude summary judgment for the Defendants includes both claims for false arrest and false imprisonment. Thus, the summary judgment on Row's entire claim must be reversed.

### III. Qualified Immunity

■ "Government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Earles,* 788 N.E.2d at 1266 (setting out a two-part inquiry for qualified

immunity). At the time of this incident, Indiana Code section 34–13–3–3 provided, in pertinent part: "A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following: ... (8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes *false arrest* or *false imprisonment.*" Ind.Code § 34–13–3–3 (1999 & Supp.2004) (emphasis added).

■ The court in *Mahoney v. Kesery,* 976 F.2d 1054, 1058–59 (7th Cir.1992) addressed the interplay of the determination whether probable cause existed to arrest, a matter often left to the trier of fact, and the determination whether the officers acted with qualified immunity, a matter usually considered to be a question of law. The court noted that, for the most part, the "jury's determination that there was or was not probable cause will automatically resolve both immunity and the merits." *Id.* at 1059.[9] Such is the case here.

Since we must reverse the summary judgment entered for the Defendants and, accordingly, Row's claims for false arrest and false imprisonment are viable, the Defendants' claims of qualified immunity are not ripe for summary judgment.

### Conclusion

Under the facts and circumstances in the present case, we cannot say that as a matter of law the undisputed facts known to the arresting officers were such that persons acting with reasonable caution and prudence would have believed that Row had committed an offense. Further, the

---

**9.** However, in *Maltby v. Winston,* 36 F.3d 548, 556–57 (7th Cir.1994), the court noted that the determination of probable cause and immunity can be separate and bifurcated. Thus, in an action pursuant to 42 United States Code section 1983, a jury might determine that probable cause did not exist yet as a matter of law, the officers can be entitled to qualified immunity. *Id.* Inasmuch as our legislature specifically has determined that qualified immunity will not ensue in the case of "false arrest" or "false imprisonment," the federal analysis is inapposite here. *See* Ind. Code § 34–13–3–3.

disputed facts raise genuine issues of material fact as to Row's claims of false arrest and false imprisonment. As such, the matter is not susceptible of a summary determination as to qualified immunity either. Thus, summary judgment for the Defendants is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded for proceedings consistent with this opinion.

DARDEN, J., concurs.

CRONE, J., dissents with opinion.

CRONE, Judge, dissenting.

I respectfully dissent.

Our supreme court has stated:

Probable cause exists when the officer, *at the time of arrest,* has knowledge of facts and circumstances which would warrant a reasonable person to believe that the defendant committed the crime. *The determination of probable cause is not one of mathematical precision, but rather is grounded on the notions of common sense.*

*Ogle v. State,* 698 N.E.2d 1146, 1148 (Ind. 1998) (emphases added, citations omitted). The Seventh Circuit Court of Appeals "has consistently held that 'once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.'" *Jones v. Watson,* 106 F.3d 774, 781 (7th Cir.1997) (citation omitted), *cert. denied.* It seems to me that the majority focuses on whether Officer Holt and Deputy Houseworth should have conducted further investigation of the row between Row and the Simons, rather than on whether genuine issues of material fact exist regarding whether they had probable cause to arrest Row *at the time of arrest.* I believe that no such issues exist and that we should therefore affirm the trial court.

Both Row and the majority emphasize that Krystall displayed no signs of bodily injury when she was interviewed by Officer Holt. It bears mentioning that "'[b]odily injury' means any impairment of physical condition, including physical pain." Ind.Code § 35–41–1–4. The majority states that "there was a likelihood that Krystall was the aggressor in a shoving match because Row 'had shoved Krystall back[.]'" Op. at 1085 (quoting Officer Holt's deposition). It seems that "back" could have two meanings here, either "in response to Krystall's initial shove" or simply "backward," in which case Row could be viewed as the aggressor. Given that Officer Holt did not state that Krystall pushed Row first, I am inclined to choose the latter.

The majority also suggests that Officer Holt failed to question the Simons' credibility regarding the alleged battery. I cannot agree. The record indicates that whereas the Simons were agitated, Row was intoxicated, and that might well have tipped the balance against him. Also, it is worth noting that Krystall exposed herself to criminal liability in making the affidavit if she knew that the information therein was false. *See* Ind.Code § 35–44–2–2(d) (false informing). As for Officer Holt's failure to show Row the affidavit before she arrested him, I am unaware of any such requirement in Indiana law.

The majority also highlights what Marshal Stepleton knew about the feud between the parties and what Row had reported to various law enforcement agencies. While this collective knowledge might be relevant in other probable cause contexts, in this case "the police officer's *actual* knowledge of objective facts and circumstances is determinative." *VanPelt v. State,* 760 N.E.2d 218, 223 (Ind.Ct.App.2001) (emphasis added). In her deposition, Officer Holt testified that she was "[v]aguely" aware of the

feud and that if she had "heard it it was probably once or twice. It wasn't to my knowledge that it was as big as it is." Appellant's App. at 212. Many assaults occur between people with a history of animosity. Finally, as for whether the officers were acting in good faith at the time of arrest, I fail to see the relevance of Officer Holt's unrelated prior and future disciplinary woes.[10]

As I see it, the issue is not whether there is a factual dispute regarding what occurred between Row and Krystall; undoubtedly there is. The issue before us is whether probable cause existed to effectuate an arrest. I believe that we must act cautiously in putting law enforcement officers under the microscope as to whether they should have further investigated the existence of probable cause, especially in a case involving a breach of the peace that might have escalated without police intervention. While some of the personalities in this case may be unsympathetic, I believe that we should refrain from attempting to define how the law *should* be enforced in this context, as opposed to deciding whether it *is* being enforced.

I am concerned that the majority's opinion may encourage inappropriate attempts to second-guess police officers in situations where they have traditionally—and by necessity—been given considerable discretion. Police officers are charged with the very difficult responsibility of maintaining order in chaotic situations that are far removed from the orderly and deliberative atmosphere of a courtroom with sworn testimony and evidentiary exhibits. While it might have been *more* prudent for Officer Holt to seek a warrant or conduct additional interviews before arresting Row, I cannot conclude that she acted *imprudently* based on the facts before her *at the time of arrest.* Consequently, I

would affirm the trial court's grant of summary judgment in favor of the Defendants.

---

10. I also fail to see the necessity of mentioning the Bowlings' alleged disparagement of Row, given that they are not defendants in this lawsuit. *See* op. at 1080–81.